Case No. 20-5151, Lori Marino, Ph.D., et al., At Balance, Whale and Dolphin Conservation v. National Oceanic and Atmospheric Administration, et al. Ms. Lewis, for the At Balance, Ms. Engels, for the Appellees. Ms. Lewis, good morning. Good morning, Your Honors, and may it please the Court, Elizabeth Lewis for the Plaintiffs. The principal issue in this case is whether plaintiffs' well-pled allegations are sufficient to support their challenge to NMSA's decision to no longer collect important data concerning the health and welfare of captive cetaceans. Accepting plaintiffs' allegations is true. There can be no doubt that plaintiffs' complaint meets the plausibility standard. Let me ask you about these allegations, about the existence of the report to begin with. Is it clear from the record that a necropsy report was even prepared by AFIS or AFIS? Your Honor, AFIS is not the agency that would be preparing the reports. The reports would be prepared by the permit holders, and that is standard. I'm sorry. You're right. Okay. Is there such a report? Do we know from the record? We do not know for certain from the record. We have alleged that there is a report. This is standard veterinary practice, and according to the terms of the permit, these necropsy provisions, the permit holders are required to prepare and submit a report to NMSA upon the death of the animal, and that's the issue of the case, is whether NMSA's decision to no longer collect these reports is whether the agency has explained its decision adequately and whether plaintiffs have standing to challenge that decision. And the court, we asked this court to reverse the ruling below for two principal reasons. First, that the plaintiffs have established standing by alleging concrete and demonstrable injuries to their professional and organizational interests, and second, that plaintiffs appropriately challenged final agency action. And so to the first point, constrain the complaint in the light most favorable to plaintiffs. Plaintiffs' alleged injuries fall well within this court's standing precedence. Standing asks the fundamental question, what's it to you? And plaintiffs have clearly answered by explaining how NMSA's decision to no longer collect these necropsy reports harms them in concrete and specific ways. For example, the individual plaintiffs are scientists and marine mammal experts who study the impacts of captivity on cetaceans. To study the effects of captivity, plaintiffs rely on the key and rare data that are contained in these necropsy reports. NMSA used to collect those data, which were then available to plaintiffs and others in the field. However, in March 2017, NMSA announced that it would no longer collect certain necropsy reports. And because NMSA no longer collects these reports, plaintiffs cannot access the important data that are contained therein. As a result, plaintiffs' science suffers. They find it difficult to pursue their chosen research questions, advocate for cetacean welfare and conservation, develop improved standards of care, and generally contribute to the scientific discourse to achieve better data-driven outcomes for cetaceans, both in captivity and in the wild. This is clearly a concrete and particularized injury in fact, and indeed it is difficult to conceive of an injury more personal than one to plaintiffs' abilities to participate in their chosen professional field. Individual plaintiffs also explained that even as NMSA's decision that it would no longer collect the necropsy reports rendered them unable to obtain the data that's vital to their research, industry-affiliated scientists retain unfettered access to the data and are able to, and do, publish papers that are not subjected to peer review and draw conclusions that are scientifically questionable. And before NMSA decided that it would no longer collect the data, plaintiffs were able to access many of the same data. As explained under the terms of these permits, the permit holders were required to submit these reports to the agency, which as the complaint alleges, were then made available to experts in the field. And without access to those same data, plaintiffs face considerable difficulties when attempting to respond or dispute industry scientists' assertions and conclusions. And as a result, their voices within their field are diminished, and this injury is highly analogous to the competitive injuries that are suffered, for example, by political actors where this court has recognized that the relative diminution in a candidate's political voice may qualify as a sufficiently concrete and particularized injury for standing purposes. Plaintiffs likewise here are competitively disadvantaged as compared to industry-affiliated scientists as a direct result of NMSA's decision. Individual plaintiffs clearly allege specific ways in which NMSA's decision injured their professional interests in conducting high-quality scientific research, contributing to their field, and advancing their own research endeavors. These injuries stem directly from, and thus are caused by, NMSA's decision to no longer collect the net curfew reports. But, Tim, I mean, your prayer for relief in this case is a little bit peculiar, let's say. Difficult to see how that's going to solve this problem. You want to vacate the decision, as we'd call it, saying we don't have authority. To do this anymore. And vacate the policy pattern and practice invoking and applying that decision. So then what happens? Well, Your Honor, the agency would have to explain its view. It would have to explain its position as to why the amendments to the statute, the 1994 MPA amendments, extinguished those permit provisions. To date, the agency has not ever explained this position. They've said that they've prepared a legal memorandum. They say that they have made this decision, but they have not offered any explanation. Further, in Aikens, where the plaintiff challenged a general enforcement policy, redressability was not defeated simply because the agency could reach the same result via a different method. One of your clients has a FOIA case pending, correct? They did, Your Honor. Does it request the legal opinion? It did, Your Honor. Yes. Where does that case stand at this point? At this point, a plaintiff's request for the memorandum was denied. It was withheld under Exemption 5, I believe. Is that a final decision? Yes, Your Honor. So is that on appeal? No, Your Honor. Will it be appealed? No, Your Honor. So what was the ground for denying you access? It was attorney work product. And so it was a judge at Kodak Tally held that it was appropriately withheld under FOIA. So if that's attorney work product, somewhere there's a final document or legal opinion, correct? Yes, Your Honor. Go on. The email that we've attached in our joint appendix makes reference to that memorandum as the basis for NMFS's decision and application of its policy to plaintiff's request. So it's now raised to your decada that you cannot get that opinion? That's correct. And yet that's part of your relief here, is it not? We are not asking for the agency's legal opinion or advice. We're asking for the agency to explain its policy within the agency's legal opinion. The explanation is we have the legal opinion. Here's the legal opinion. Well, Your Honor, we don't know what's in that legal opinion. It could be an evaluation of litigation risk. It could be any other legal advice that would be appropriately withheld from a client, from the attorney to the client. What we are seeking and what the agency has an obligation under administrative law principles to provide is an explanation for its decision, for its enforcement policy. So you said in the page, pardon me, at paragraph 60 of your complaint, which is on page 34 of the joint appendix, about seven lines down or so on the slides, if NMSF, what do you call it? NMFS, determines at any point that the applicant or facility holding the mammal, the marine mammal that is subject to a special exception permit no longer meets those requirements. It may revoke the permit and seize the animal, right? So there's no certainty at all that this litigation will result in actual revocation or enforcement in any way. We are not seeking to have any particular permit or animal seized or moved. What we are seeking is the information that NMSF is supposed to have in its possession under the terms of the permit, these- That's a FOIA case. So you're seeking, vacating the email and the policy, right? Yes, your honor. The policy, not any permit.  How would you state the policy? The policy is to what, not enforce the permits? The policy is that NMSF has determined that the 1994 amendments have extinguished these certain permit provisions. And because these permit provisions are no longer valid, the, excuse me? That's not a policy. That's a legal decision. What's the policy based on it? That is the policy. The policy is that NMSF will no longer be requesting or collecting this information. Okay. So if that is vacated, it goes, we go back to the situation where the agency may revoke the permit, right? If that's vacated, then the necropsy provisions, these provisions that we're discussing, remain valid and remain parts of the permit holders' legal obligations as a condition of holding that animal. And therefore, when that animal dies, as Tilikum did, as Kasatka did, then that facility is under an obligation under that still valid provision of its permit to submit this information to the agency as they used to be obligated to do. I'm trying to figure out. It seems to me that it's very peculiar the way this is framed as to whether it is what's been called in another case a programmatic attack or an attack on specific challenge to, I should say, specific enforcement decisions. If it's a programmatic attack, you have a problem. If it's a challenge to specific enforcement decisions, you have a Hector V. Cheney problem. So you're slicing the bologna very thin, it seems to me, where you say in here, well, in the way in which this whole thing is framed up, trying to, I mean, on one hand, you say at various places, you're not challenging specific instances, correct, of failure to act. We aren't challenging the agency's decision not to enforce. You know, that is a heckler problem. But in making this decision, the agency didn't rely on its prosecutorial discretion. And so this case, you know, it falls under that heckler exception where we are looking at this policy that is being applied in a way that injures plaintiff's interests. And you want to declare, vacate the policy pattern and practice. Why isn't that a so-called programmatic attack? We aren't attacking or challenging the agency's overall administration of the special exception permit program. We are attacking their application of this policy, which we find, which we believe is arbitrary and capricious to the specific denials of plaintiff's request in these specific instances, which is the normal course of challenging agency, action agents, broad agency policies in the EPA context. Thank you. Could I ask, on the standing, at least of the organization, how do you distinguish EPIC? And that's an opinion where we spoke at length about Aikens, which is the font of informational injury theories. We spoke at length about Havens, which is the font of organizational injury theories. We spoke at length about PETA, which is, I think, your best case for organizational standing here. And we said pretty clearly that if you don't satisfy Aikens, you don't have an informational injury. And if you don't have an informational injury and the harm to the organization is not getting information, that's a very good indicator that you don't have organizational standing. Well, Your Honor, I would distinguish EPIC on two grounds. First, on the facts, the main issue in EPIC was not that EPIC didn't have a statutory entitlement to that information. In fact, the court expressly did not assess that first factor when assessing informational standing. The issue was that EPIC didn't have a cognizable interest in the information at issue. There was a privacy assessment that was focused on protecting individuals. Sorry, what would create the cognizable interest on a concrete Article III injury other than a statute like FOIA? I mean, if the plaintiff has, it's more akin to the zone of interest. And you can see this analysis actually in the Friends of Animals versus Bernhardt case where plaintiffs in that case, Friends of Animals had an organizational injury. They had organizational standing without any statutory right to that information. And in fact, Judge Silverman in a footnote noted that that ship has sailed on the argument that plaintiffs are required  to have a statutory right to the information. This isn't just a generalized grievance or an ideological interest. Well, the other elements of organizational injury do guard against that. Organizational injury also requires the plaintiff to prove that the mission, that there's a consequent drain on the resources. An organizational plaintiff could not come in and just say that we have been deprived of information that we want and have organizational standing. That's not the test. The test is that they have to allege a concrete and particularized injury of which the deprivation of information can be one. But they also have to allege those other elements, which ensures that the injury is not generalized. Could an individual similarly situated to PETA run the same theory? Which is to say, okay, I can't cite any statute giving me a right to information. And all of my harms flow from the failure to get information. But you know what? I'm really invested in this issue. And I do, I broadcast all of these things on my own as an individual. So that failure to provide information harms me as an individual more than John Q. Public. Would that be a good theory of standing for the individual? Yes, Your Honor. And in fact, in the American Friends versus Webster case that is cited in the briefs, that is the exact injury that was alleged. The Federal Records Act does not give plaintiffs a right to the information. All that provides is that the agency has to collect and retain certain records. And so that injury is highly analogous. And again, I say that in order to show that the plaintiff is injured, they do have to show that that deprivation impacted them in a concrete and particularized way. Which is what individual plaintiffs have shown here. And it's what the individual plaintiffs in the American Friends case. So any individual with the canonically non-concrete injury of being offended at how the executive branch is conducting its business can create Article III standing just by engaging in an issue and saying, I want to publish this information to expose the maladministration of the program. Your Honor, I think that, you know, as with all standing questions, it's a highly fact-specific question. Here, you know, our plaintiffs are undisputed experts in their field. I'm not questioning their commitment. Sure. But it just seems like that it blows a pretty big hole in some basic standing principles. I, in with individual plaintiffs, and they have a longstanding demonstrated interest in this topic. They've been able to show that they are harmed by this deprivation in very concrete and particularized ways. And that is the key. And they have a cognizable interest in their career pursuits. This court previously has recognized plaintiff's interest in maintaining their careers and engaging in their careers. And when a government action does impact that again, and you need a final agency action, all the other elements must be satisfied. And, you know, additionally, with reputational injury, that is also well established. But all those requirements are satisfied. A plaintiff does have standing to challenge a government action that injures its concrete interests. Thank you. Judge Ginsburg, do you have any other questions? Oh, thank you. All right. And we'll hear from Ms. Engels. Good morning, and may it please the court. I'm Summer Engels for the federal appellees, and we ask the court to affirm. At its core, this case is about plaintiff's effort to derive information potentially relevant to their interests from the services regulatory relationship with SeaWorld. But because they're not entitled to that information, they lack standing. And even if they had standing, they failed to state a claim because they have not identified a final agency action. For those reasons, we ask the court to affirm. I'd like to begin today with standing, and specifically the government's argument that plaintiffs have asserted and failed to satisfy the relevant test for informational injury. All of plaintiff's harms here stem from the sense that they've been deprived of information that they want the government to produce. And therefore, they've triggered the two-part test for informational standing. The first part of that test asks whether they have a statutory entitlement to that information. Plaintiffs here identify no statutory entitlement. And in fact, they assert that they're not obligated to identify an entitlement at all to satisfy the test. Suppose you're right about the informational injury part of your case. They couldn't establish informational injury under Aikens. Their theory is they don't have to because they satisfy a different organizational injury test. And as some of my questions suggested, I find that a little bit problematic. But what do you do with Friends of Earth, Friends of Animals versus Bernhardt? I mean, it's a 2020 case from this court. And all you say in your brief is you just give us a but-see site to it. And that's probably not good enough for a panel bound by pressing. Understandably. The relevant discussion in Bernhardt was a one-line footnote. And we think the case is distinguishable because at least there, the plaintiffs asserted that the Endangered Species Act required the Fish and Wildlife Service to publish information in the Federal Register rather than complete it on a case-by-case basis that wouldn't be subject to publication. And that deprived them of information. So in that sense, even though the court said in the footnote that the ship had sailed, there was still at least some basis for the plaintiffs to say that they had an entitlement to that information. Now, Bernhardt is a unique case. Sorry, I missed that. Help walk me through that. So the Bernhardt decision said the ship has sailed. But in the section after that, when the court... Ship has sailed on the proposition that the lack of the failure to satisfy the informational injury test under Aikens defeats the claim of organizational standing under Havens. That's how I read it. So that's correct. The court was saying that the first part of the informational injury test, which requires the identification of some statutory entitlement, that element had sailed. But I think that Bernhardt can be read comfortably with the other informational standing precedents and is distinguishable from this case because the plaintiffs were claiming that the agency's change in procedure deprived them of information that they asserted had to be published in the Federal Register. And here we don't have any sort of similar statutory or even regulatory hook that gives the plaintiffs any sort of right to information. Now, the statute at issue in Bernhardt was different from other classic informational injury statutes. But I think because it could be read broadly as a disclosure provision, it can be reconciled on its facts. I mean, it's not the more obvious reading of Bernhardt. I guess your position has to be that a broad reading of Bernhardt would bring it into conflict with Epic. And so we need to, I don't know, spin sounds pejorative, but we need to narrow it because Epic seems strongly in your favor. That's correct. Also, I would point the court to TransUnion, which confirmed again that the first part of the informational injury test requires the identification of a statute. Also, Friends of Animals v. Jewel, which came after the PETA decision, held that the plaintiff there didn't have standing because it couldn't satisfy the first part of the informational injury test.  is very important. As the court recognized in the Ling case, informational injury in its broadest sense exists day in, day out, whenever federal agencies create information that a member of the public would like to have. And so it's necessary to have this hook to ensure that we're not opening up a Pandora's box or articulating a rule that lacks a limiting principle. And also, the idea that an organization has developed activities centered around information does not mean that they should be able to evade the two-part informational injury test. The Judge Millett's opinion in PETA v. USDA explained that there's no reason to allow an organization to proceed where an individual might fail. And I think plaintiffs identify or seek to identify what they assert are limiting principles in the organizational injury analysis. But the court explained in Epic that if an injury, if a plaintiff or organization says that it's harmed because its activities have been impaired, because they don't have information, if they don't have a legal entitlement to that information, then the injuries are sort of self-inflicted. And I think that's the problem here. Even if we look at the organizational standing test, which we don't think is the proper framework for this case, plaintiffs' arguments fail because they don't have any hook that entitles them to this information. Separate from the legal entitlement or informational injury analysis, they also fail the organizational expenditures or change their resources to account for any sort of government decision here. On JA23, they talk about the fact that they will spend resources submitting FOIA requests and observing whales, but they identify no basis to, they don't allege that these are changes in resources. The record also makes clear, the complaint makes clear that they have spent resources submitting FOIA requests and observing whales all along. In the reply, they say that they will submit more FOIA requests and spend resources identifying other agencies to submit the requests to, but that's just not part of the complaint, and they cannot amend it through briefing on appeal. Ms. Engels, can I ask you the same question I asked Ms. Lewis? This is a suit about getting information that may not even exist. And we are all tied up and standing, and I'm more concerned about redressability. Do we know, on this record, whether the necropsy was performed, whether the report was made, prepared, and whether it still exists in view of this three-year retention policy? So, I can tell you that the service's position is that in 1994, it was, its authority to oversee the care of captive marine mammals was transferred, or it was made clear that it was within the wheelhouse of the Animal and Plant Health Inspection Service, which has extensive regulations that apply to this sort of, to these sorts of activities. 9 CFR 3.100G says that captive facilities that hold these marine mammals need to prepare necropsy reports and keep them for three years so that they can be available for APHIS when they're requested. Now, I think, I cannot confirm, I have not seen these reports. My client is not the agency responsible for these reports at this point, but based on the regulations, if SeaWorld is complying, the report should have been produced in 2017 for APHIS's inspection. So, have the plaintiffs sued the wrong defendant? I don't feel comfortable saying that if they sued APHIS, they would get the reports. I think that if they wanted to get them, APHIS is the better party because they're the agency responsible for regulating the care and taking of captive marine mammals. They have in the past undertaken inspections of these reports. I don't know that they've done it here. I think for relevant purposes, the problem is that the orcas of interest to plaintiffs died in 2017, and now more than three years have passed. So, it's possible that the reports are no longer available just based on the way the APHIS regulations have worked. Well, but there's nothing that orders them to destroy them after three years, right? That's true. That's true. It's just that they have to be maintained for three years, and so I can't say confidently that they're still available or that that would be an avenue of redress. But in any event, that's a regulatory regime that's not managed by the service. It's managed by USDA and the Animal, Plant, and Health Inspection Service. All right. Are there any more questions of Ms. Engels? No, thank you. All right. Ms. Lewis, why don't you take two minutes? Thank you. I just have four quick points. As your Honor noted, the regs require the preparation of this report, and NIMS has never denied that they exist. So, at this stage, we think that the complaint does plausibly infer that they do exist, and we are suing NIMS over its decision with respect to a permit over which it does have jurisdiction. I issued the permit. That's the whole issue in the case, and so NIMS is the proper agency for us to be suing. And as far as Friends of Animals versus Bernhardt, there's a huge difference between a claim that the agency could not proceed by making these case-by-case determinations without a regulation versus an affirmative disclosure requirement, which this Court's precedents have made extremely clear that a very clear, firm statutory entitlement is required to form the basis of informational standing. And so, informational standing was very clearly not alleged in that case. It rested entirely on organizational standing. And to your Honor's question about EPIC, again, EPIC did not rely on a statutory entitlement to deny informational or organizational standing, and we'd also remind the Court that PETA, in the seminal case on this issue, also did not have a statutory entitlement to the information that it sought, yet still had organizational standing. And Judge Millett's opinion, in fact, noted that the majority's opinion walked the path with circuit precedent in finding that organizational standing existed even without a statutory entitlement to the information. And if the Court has no further questions, I respectfully request that the ruling below be overturned. Thank you.
judges: Henderson, Katsas, Ginsburg